UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60284-CIV-GRAHAM/TORRES

DERMWORX, INC.

       Plaintiff,

v.

EUGENE R. COOPER,

       Defendant.

_____/

## REPORT AND RECOMMENDATION
## ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### *I. INTRODUCTION*

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [D.E. 4] filed on February 24, 2009. The District Judge referred the Motion to the undersigned Magistrate Judge on March 3, 2009. The Court conducted an evidentiary hearing on March 13, 2009, during which both sides presented testimony and evidence. Based on the motions and responses thereto, the testimony of witnesses (live and by affidavit), the evidence in the record, and oral and written arguments of counsel, Plaintiff's Motion is granted.

This case arises out of a dispute over patent ownership to certain two topical drug delivery systems. Plaintiff DermWorx, Inc. ("DermWorx"), a South Florida based pharmaceutical company, is suing Defendant Doctor Eugene Cooper ("Dr. Cooper") for alleged breach of implied-in-fact employment contract and breach of fiduciary duty.

## II.  PROCEDURAL HISTORY

On February 20, 2009, DermWorx filed a complaint alleging two claims of breach of an employment contract and two claims of breach of fiduciary duty. [D.E. 1]. Four days later, on February 24, 2009, Plaintiff filed a Motion for Preliminary Injunction seeking to enjoin Defendant from: (1) contesting DermWorx's exclusive rights to the pending patent applications relating to topical dermatology products and methods; (2)  assigning or attempting to assign to any person or entity other than DermWorx the rights to those applications, and (3) further commanding Dr. Cooper to execute formal assignments of the applications to DermWorx. [D.E. 4].  Plaintiff's Motion was accompanied by various exhibits and an affidavit of Norman M. Meier, the Executive Chairman of DermWorx.

On March 12, 2009, Defendant filed its Opposition to Plaintiff's Motion. [D.E. 24].  Subsequently, on the same day, DermWorx filed a Reply to Defendant's Opposition. [D.E. 28].  An evidentiary hearing was held on March 13, 2009. The Court heard testimony from Dr. Cooper, as well as, Mr. Meier.

At the hearing, Defendant stipulated to executing formal assignments of the applications to DermWorx.  Therefore, the only two remaining issues before the Court are whether Dr. Cooper should be enjoined from (1) contesting DermWorx's exclusive rights to the two patent applications and (2) assigning such rights to any other third party.

## III.  FACTUAL BACKGROUND

### A.  *DermWorx*

DermWorx, is a start-up pharmaceutical company that specializes in development of topical dermatology products.  It was established in March, 2005 by Norman Meier, who currently serves as the Executive Chairman of the company, Steven Girgenti, who serves as the President and Chief Executive Officer, and David Cohen, who serves the Executive Vice President of Operations.  The company's products include a topical anesthetics for the skin and anti-fungal products for nails.  In the course of developing these products, DermWorx developed certain proprietary technology, which it named and trademarked as the Small Molecule Solubilization System ("SMSS").  SMSS is a specialized drug delivery system that introduces active ingredients topically to skin or nails.

### B.  *Dr. Eugene Cooper*

Dr. Cooper, a chemist, is a part-time high school teacher and a consultant in the field of theoretical chemistry.  Prior to becoming a teacher, Dr. Cooper worked for Procter & Gamble Company in Cincinnati, Ohio where he conducted research on skin permeation and developed a comprehensive model and explanation for transport properties of skin.  After working for Procter & Gamble, Dr. Cooper joined Eastman Kodak Company in Philadelphia, Pennsylvania to head the pharmaceutical formulation development group, Nanosystems, L.L.C.

Over the course of his career, Dr. Cooper obtained over twenty patents, mainly in the area of drug delivery systems and nano technology.  Also, while at Procter & Gamble, Dr. Cooper conducted extensive studies on small molecule delivery systems.

At that time, however, Dr. Cooper's studies were not fully developed and utilized mainly due to Procter & Gamble's limited interest in pharmaceutical business.

Sometime in 2005, Dr. Cooper, along with Dr. Alan Laites and Dr. Vanaja Ragavan, formed Aviana Molecular Technologies, Inc. ("Aviana"). The company concentrated on development of pharmaceutical product formulas with particular interest in development of treatment for nail fungal infections. With the aid of Dr. Cooper's prior research and experience during his time at Procter & Gamble, Aviana filed patent applications for topical delivery systems utilizing small molecular weight substances to treat nail infections.

### C. *The DermWorx - Cooper Relationship*

On February 25, 2006, Dr. Cooper, Dr. Laites and Dr. Ragavan met with Dr. Cohen and other DermWorx representatives to discuss the products and ideas generated at Aviana. Specifically, Dr. Cohen was interested in the idea of using volatile solvents to assist in the topical delivery of skin medications. Aviana's provisional patent for small antifungal agents treatment of nail fungal infections, however, was not patentable because it involved utilization of sodium omadine, an element that was already included in another provisional patent application submitted some twenty years earlier. Nonetheless, after the February meeting, Dr. Cooper and the representatives of DermWorx started a professional relationship due to parties' mutual interest in development of successful topical delivery systems.

The relationship grew. DermWorx maintained strong interest in developing a patentable topical drug delivery system with the aid of volatile solvents. Naturally, Dr. Cooper's experience and knowledge would have greatly aided in achieving that

goal. On October 12, 2006 DermWorx and Dr. Cooper entered into an employment agreement, which established Dr. Cooper as the Executive Vice President of Research and Development and awarded him the rights to 170,000 shares (2.07%) of founder's stock in the company. DermWorx agreed to pay for all research and development expenses. Upon DermWorx's completion of its financing, Dr. Cooper was to receive, in addition to the shares already granted, a $150,000 salary, a laboratory, and other benefits including health insurance and performance options. The October employment agreement bears the signatures of both Dr. Cooper and Norman Meier, DermWorx's Executive Chairman.

Thereafter, DermWorx paid for all of the research and development activities, including payments for chemicals, supplies, and other materials. During the course of his research and development activities, Dr. Cooper assisted in developing and supervising the testing of several product formulations that employed novel drug delivery technologies. In addition to collaborating with Dr. Cohen, Dr. Cooper regularly reported to DermWorx's senior management who directed his research and development activities.

Dr. Cooper represented himself to others outside of the company as an officer of DermWorx. He also participated in meetings with investment banks and individual investors and was held as a key member of executive management. Mr. Cooper also had business cards, prepared at DermWorx's expense, identifying him as DermWorx's Executive Vice President of Research and Development.

On February 8, 2007, DermWorx filed a provisional patent application for a certain drug formulation that used omadine as a nail anti-fungal. Dr. Cooper and Dr.

Cohen were named as co-inventors. A year later, on February 8, 2008, upon filing of the complete utility application, both Dr. Cooper and Dr. Cohen assigned their rights in this patent application to DermWorx.

On July 16, 2008, DermWorx filed a provisional patent application for a Small Molecule Solubilization System ("SMSS"), relating to the SMSS drug delivery technology itself. Dr. Cooper actively participated in the drafting of the application. The application named both Dr. Cooper and Dr. Cohen as co-inventors. At that time, however, Dr. Cooper refused to assign his rights in the SMSS application to DermWorx.

On August 13, 2008 DermWorx filed a continuation-in-part application based on the application first filed in February, 2007, relating to the use of omadine (the "omadine CIP patent application"). Likewise, the omadine CIP patent application named Dr. Cohen and Dr. Cooper as co-inventors. Once again, Dr. Cooper refused to assign his rights in the application to DermWorx.[1]

The summer 2008 filings of the provisional patent application for the SMSS drug delivery technology and the omadine CIP patent application marked the beginning of the disagreement that, eventually, resulted in this lawsuit. On July 14, 2008, just two days before the SMSS application was filed, Dr. Cooper stated to one of DermWorx's patent agents, Dr. Joanne Holland, that he believes to be the sole inventor of all the formulation patents, and that Dr. Cohen was not a co-inventor of any.

---

[1] As previously stated, however, during the March 13, 2009 evidentiary hearing, Dr. Cooper agreed to assign to DermWorx his rights to both patent applications.

Furthermore, few days later, Dr. Cooper reaffirmed his belief to Mr. Meier, stating that he no longer considers himself an employee of DermWorx. From that point on, numerous attempts to renegotiate the nature and terms of the employment relationship between Dr. Cooper and DermWorx were unsuccessful. On December 10, 2008 the negotiations ceased and this litigation followed.

## IV.  ANALYSIS

### A.  *Standard of Review*

To obtain a preliminary injunction, a Plaintiff must demonstrate the following: "(1) a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002); *see also Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) ("[b]ecause a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion."). However, "[i]f the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to

injunctive relief." *1-800 Contacts*, 299 F.3d at 1247 (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)).

The goal of a preliminary injunction is to prevent irreparable harm and to "preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). "[T]he most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act." *Id.* at 573; *see also All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) ("Preliminary injunctions are issued when drastic relief is necessary to preserve the *status quo*.").

When an injunction does more than preserve the status quo, however, an even stronger showing is required. *See, e.g., Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction . . . especially at the preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party."); *United States v. Board of Educ. of Green County, Miss.*, 332 F.2d 40, 46 (5th Cir. 1965) ("mandatory injunctions are rarely issued and interlocutory mandatory injunctions are even more rarely issued, and neither except upon the clearest equitable grounds").

B.     *__Breach of Fiduciary Duty Claim__*[2]

To succeed on a breach of fiduciary claim under Delaware law, Plaintiff must demonstrate (1) that a fiduciary duty exists and (2) that the fiduciary breached that duty. *York Lingings v. Roach*, No. 16622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999). "Both officers and directors of a corporation owe fiduciary duties to the company and its shareholders." *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1116 n.75 (Del. Ch. 2008). Fiduciary duties of corporate officers include traditional duties of loyalty and due care. *In re Gaylord Container Corp. Shareholders Litig.*, 753 A.2d 462, 475 (Del. Ch. 2000). "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer, or controlling shareholder." *Cede & Co. v. Technicolor*, 634 A.2d 345, 361 (Del. 1993) (internal citation omitted). "[A] corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position [inimical] to his duties to the corporation. *Broz v. Cellular Info. Systems, Inc.*, 673, A.2d 148, 155 (Del. 1996).

We will next apply the standard of review to Plaintiff's breach of fiduciary duty claim.

---

[2]     Plaintiff's Motion is premised on breach of fiduciary duty claims, as well as breach of contract claims. However, because Plaintiff has satisfied all necessary elements under the breach of fiduciary duty claims, the Court will not address the contract claims premise.

### *1.  Likelihood of Success on the Merits*

It is undisputed that Dr. Cooper joined DermWorx in 2006 as the company's Executive Vice President of Research and Development.  He thus owed DermWorx a fiduciary duty.  *See, e.g., In re World Health Alternatives, Inc.*, 385 B.R. 576, 591 (Bankr. D. Del. 2008) ("Although often overlooked, corporate officers, including senior officers such as the . . . General Counsel, Executive Vice Presidents, . . . and others are 'agents' of the corporation.  Agency is a fiduciary relationship.  Even though senior officers of corporations typically have employment agreements, they still occupy a fiduciary status in relation to the corporate principal.") (quoting Lyman P.Q. Johnson & Mark A. Sides, *Corporate Governance and the Sarbanes-Oxley Act: The Sarbanes-Oxley Act and Fiduciary Duties,* 30 Wm. Mitchell L. Rev. 1149, 1205-06 (2004)).  In addition to executing an employment agreement with DermWorx, Dr. Cooper accepted 500,000 shares in the company.  We conclude, therefore, that substantial evidence indicates that Dr. Cooper, as a corporate officer of the company, owed fiduciary duties to DermWorx.

Next, we address the issue of whether Defendant committed a breach of that duty by inappropriately unsurping a business opportunity. DermWorx has sufficiently satisfied the four elements outlined by the *Broz* holding.  First, DermWorx proffered unrebutted testimony by Norman Meier regarding DermWorx's investment opportunities.  According to Meier, DermWorx is in the process of securing a potential $5 million investment geared towards further development, production, and eventual marketing of products based on both the SMSS and omadine CIP patent applications.

Thus, Plaintiff is clearly financially able to exploit its ownership interests in both patent applications. It is also undisputed that utilization of both patents is within DermWorx's line of business. Plaintiff has also submitted sufficient evidence that indicates that DermWorx has been interested in developing these patents since 2006. Therefore, the first three *Broz* elements are clearly satisfied here.

Finally, Dr. Cooper's continuing refusal to assign ownership rights in the patents, thus blocking its application process with the US Patent Office, was not in the company's best interest. Furthermore, the evidence suggests that Dr. Cooper attempted to use the assignment as a leverage during numerous attempts of renegotiation of his employment contract. In addition, Dr. Cooper admitted to performing confidential consulting work for other pharmaceutical companies, while serving as an Executive Vice President of DermWorx, without disclosing it to the board of directors. Therefore, we conclude that the fourth *Broz* element is also satisfied.

The Court finds that Plaintiff has made a substantial showing of likelihood of success on merits on its breach of fiduciary duty claim.

### 2. *Irreparable Harm*

Irreparable harm is the "*sine qua non* of injunction relief." *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Without a finding of a likelihood of an "actual and imminent" irreparable injury, preliminary injunctive relief is improper. *Id.* To satisfy this requirement a movant must show a significant threat of irreparable harm, and not merely rely on remote or speculative

injuries. *See, e.g., Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992) (injunction is inappropriate if possibility of future harm arising from the behavior plaintiff seeks to enjoin is purely speculative); *Northeastern Fla. Chapter*, 896 F.2d at 1286 (conclusory allegation of irreparable harm in verified complaint and assertion of speculative economic injury at injunction hearing were inadequate to support an injunction order).

Plaintiff argues that Defendant's potential disclosure of any confidential information regarding both patents to the third parties, as well as Defendant's ownership claim to them, pose a substantial risk to DermWorx's existence. According to Plaintiff, DermWorx committed significant amount of resources in development of both patents. Plaintiff further argues that Dr. Cooper's actions that are inconsistent with DermWorx's exclusive ownership rights will jeopardize company's efforts to obtain financing. Defendant, on the other hand, contends that there is no irreparable injury because his alleged misconduct can be remedied by damages. Although we partially agree with Defendant that much of the harm can be compensated by damages, we are not convinced that it would be possible to reasonably calculate and compensate all of the injury. *See, e.g., Merrill Lynch, Pierce, Fenner, & Smith Inc. v. Kurgis*, No. 2:08-cv-777-FtM-99DNF, 2008 WL 4710919, *3 (M.D. Fla. Oct. 23, 2008).

The evidence indicates that DermWorx is a relatively small and new start-up pharmaceutical company. According to uncontradicted testimony of Mr. Meier, much of DermWorx's future depends on the success of this lawsuit and the overall success of the drug based on the SMSS and Omadine CIP patent applications. Disclosure of

trade secrets associated with the development of these patents, before the conclusion of this litigation, will essentially render any future judgment in favor of Plaintiff meaningless. *See, e.g., FoodComm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) ("[I]nadequate remedy at law does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered.").

The Court finds that DermWorx will suffer irreparable injury if Dr. Cooper is not prevented from assigning his rights to third parties and contesting DermWorx's exclusive rights to the SMSS and omadine CIP patent applications.

### 3.  Balance of Hardships

During the pendency of this litigation, the inability by Defendant to contend exclusive rights to the two pending patent applications has little effect on him. Should Dr. Cooper prevail on the merits of the case, he will be free to assign/sell his inventorship rights to other pharmaceutical companies. Grant of this injunction only serves as a deferment of potential profits for Defendant. DermWorx, on the other hand, faces a prospect of going out of business if the injunction is not granted. We, therefore, conclude that Plaintiff has established that the potential harm to DermWorx outweighs the harm the preliminary injunction may cause to the Defendant

### 4.  An Injunction Would not Disserve the Public Interest

Finally, an injunction will not disserve the public interest because it will preserve the *status quo* between the parties while during the pendency of this litigation.

## V.   CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Plaintiff's Motion for Preliminary Injunction [D.E. 4] be **GRANTED**. In order to maintain *status quo*, until trial on the merits, Defendant Dr. Eugene Cooper should be enjoined from, doing or acting in concert with others to do, the following:

1. Disclose to any third party or use for his own benefit or the benefit of others, any confidential or proprietary information or materials of Plaintiff DermWorx Incorporated including, without limitation, Confidential Information and materials developed by Defendant on or after October 12, 2006 arising from or relating to research being conducted by or on behalf of DermWorx, including the information set forth in one or more of the patent applications filed by DermWorx, it being understood that for the purposes of this Order, "Confidential Information" shall not include information or materials generally available to the public, or information released to the general public without restriction;

2. Make, use, sell, license, transfer, or have made a topical local drug delivery system using a volatile solvent component;

3. Hold himself out to the public or any third party as the owner, licensee, or as a person who is otherwise authorized to commercially develop or exploit in any manner, the technology as disclosed in U.S. Patent Application No. 61/135,103 ("Application");

4. Filing a patent application, or making other filings or taking other steps, alone or in concert with others, to obtain patent rights (a) that would, if issued, interfere with those rights that Plaintiff seeks to obtain through the Application and/or

(b) covering the same or substantially similar patent subject matter as the subject matter covered by the Application;

     5.    Make other statements or take other actions with the purpose of preventing Plaintiff from obtaining the patent rights sought by Plaintiff through its prosecution of the Application.

The parties shall have five (5) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Donald L. Graham, United States District Judge.  Given the nature of the remedy sought, the Court will expedite the period for filing objections as per S.D. Fla. Local Mag. J. R. 4(b).  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of any issue included in the Report and shall bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1); S.D. Fla. Local Mag. J. R. 4(b).

**DONE AND ORDERED** in Chambers, Miami, Florida this 3d day of April, 2009.

                                                        */s/ Edwin G. Torres*
                                                      EDWIN G. TORRES
                                                      United States Magistrate Judge